Gail BROOKINS dba Ernie Glide Transmissions, a sole proprietorship, and Ernie Brookins, Plaintiffs,

v.

WISSOTA PROMOTERS ASSOC., INC., Don Roseen, Earl Benson, & Randy Buss, Defendants.

No. A3–00–06.

United States District Court, D. North Dakota, Southeastern Division.

March 21, 2000.

---

---

## MEMORANDUM AND ORDER

WEBB, Chief Judge.

### I. Introduction

Plaintiffs have moved this court for a preliminary injunction to enjoin the defendants from enforcing certain recently adopted rule clarifications for "modified" stock car racing and mandating that defendants allow Wissota racers, who wish to, the ability to use plaintiffs' transmission products. A hearing was held February 23, 2000, on this matter at which time the court took the motion under advisement. After reviewing the numerous affidavits and the deposition testimony filed with the court along with the motion papers, briefs, the testimony presented at the hearing and the arguments of counsel, the court is ready to rule. The relevant facts as adduced at the hearing, through filed affidavits, and deposition testimony, are as follows.

### II. Background

Plaintiffs are in the business of developing, producing, and selling products used in stock car racing. Ernie Brookins holds several patents for transmissions; his wife, Gail, is the record owner of the sole proprietorship, Ernie Glide Transmissions, which sells these products. Wissota Promoters Association, Inc., a Minnesota nonprofit corporation, is the rule making authority and sanctioning body for a group of racetrack members-promoters who conduct amateur stock car races in the Midwest. The individual defendants are members of either the Wissota board of directors or the technical committee.

As a sanctioning body, Wissota has developed uniform rules for competition and vehicle specifications so that amateur oval track car racing competition can take place at multiple locations with the same applicable rules. Wissota sanctioned racing occurs in six states and two Canadian provinces, amounting to about 54 total racetracks. The promoters within Wissota, who are track owners or operators, are the only persons who may vote on policy decisions, including the rules of competition and vehicle specifications. Drivers, car owners, equipment manufacturers and suppliers may not vote and are not members of Wissota. At the last annual meeting the promoters had the choice between adopting an open transmission rule, which would allow any type of transmission to run in the modified class, or a "rule clarification," which limited the type of transmission in the modified class to OEM (Original Equipment Manufacturer) or

stock type parts. By a vote of 15–4, the promoters adopted the clarification to Wissota's transmission rule for the modified class.

The plaintiffs claim that this "rule clarification" was purposefully designed to "outlaw" their transmissions for use within Wissota sanctioned modified class races. Plaintiffs have brought suit against the defendants claiming intentional interference with contractual relations, intentional interference with prospective business advantage, and defamation and slander.

Plaintiffs' primary business is developing and selling transmissions to amateur race car drivers. Approximately 25% of the plaintiffs' business is derived from transmission sales to Wissota drivers. About one third of Wissota drivers use the plaintiffs' transmissions. The majority of plaintiffs' business, however, comes from sales to International Motor Contest Association (IMCA) drivers. The IMCA is the largest sanctioning body for amateur race car drivers in the United States with approximately 6,000 modified class drivers and 160–170 racetracks. Plaintiffs allege that the "rule clarification" will dilute their business since Wissota drivers will sell off their Ernie transmissions to IMCA drivers at various trade shows. Thus, plaintiffs argue, not only will they lose the direct sales to Wissota drivers but also the sales to IMCA drivers. The effect of these lost sales, according to plaintiffs, will be the loss of their business goodwill and entire business as it is currently deeply in debt for reasons unrelated to the Wissota "rule clarification."

Although the plaintiffs are unsure why Wissota would want to put them out of business, they theorize that they have incurred the resentment of the association by challenging its rules in the past. As theorized by the plaintiffs, this resentment led to the adoption of a rule which they

claim, is unenforceable on its face since no transmission could comply. Wissota counters by arguing that the intent of the rule clarification was twofold: first, to return to the original intent of the modified class by using OEM or stock type transmissions which can be purchased fairly cheaply; and second, to bring Wissota's rules in line with IMCA rules to foster cross-over drivers. The irony of defendants' argument is that evidence has been presented which tends to support that the types of transmissions that are "legal" within the Wissota rules are not widely available. Additionally, the evidence supports that post "rule clarification" the Wissota and IMCA transmission rules differ significantly; the effect being that the plaintiffs' transmission can run in IMCA sponsored modified races but not in Wissota sponsored modified races.

Two additional facts should be noted. First, plaintiffs' early model transmission, the Ernie Slide I, had tacit approval to run in Wissota sponsored races. Wissota knew that the Ernie Slide I was being used by racers; and the Ernie Slide I was shown at Wissota sponsored technical shows. Second, plaintiffs have successfully sued the IMCA in the past on the same theories presented here under loosely similar circumstances.

### III. Discussion

 The granting of a preliminary injunction is an extraordinary remedy that will not issue unless the right to such relief is clearly established by the movant. *Ferry–Morse Seed Co. v. Food Corn, Inc.,* 729 F.2d 589, 593 (8th Cir.1984). In reviewing a request for a preliminary injunction the court must consider these four factors: (1) the threat of irreparable harm to the movant; (2) the balance between this harm and the potential harm to other parties; (3) the probability that the movant will

succeed on the merits; and (4) the public interest. *Dataphase Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109, 114 (8th Cir. 1981) (en banc).

### A. The Threat of Irreparable Harm

■ While the court in *Dataphase* remarked that "in balancing the equities no single factor is determinative," it also stated that "the absence of a finding of irreparable injury is alone sufficient ground for vacating [denying] the preliminary injunction." *Id.* at n. 9. *See also United Industries Corp. v. Clorox Co.,* 140 F.3d 1175, 1183 (8th Cir.1998). Thus, "the threat of irreparable harm" is a threshold inquiry. *Gelco Corp. v. Coniston Partners, et. al.,* 811 F.2d 414, 418 (8th Cir.1987) (noting that "[t]he failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction"). *See also Glenwood Bridge, Inc. v. City of Minneapolis,* 940 F.2d 367, 371 (8th Cir. 1991) (quoting *Gelco,* "[t]he threshold inquiry is whether the movant has shown the threat of irreparable injury."). Consequently, the movant must show irreparable harm.

Plaintiffs allege that they will be irreparably harmed absent a preliminary injunction since they will lose their business, their business goodwill, and also their home which is in the same location as their business. These are undoubtedly important losses to the plaintiffs. The court is constrained to note, however, that these losses are compensable through the claims for money damages which the plaintiffs seek. "The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Bandag, Inc. v. Jack's Tire & Oil, Inc.,* 190 F.3d 924, 926 (8th Cir.1999). Here the plaintiffs have an adequate legal remedy, i.e., damages. A preliminary injunction is unwarranted when the movant can be fully compensated through a claim for damages. *See Glenwood Bridge, Inc. v. City of Minneapolis,* 940 F.2d 367, 371–72 (8th Cir.1991). *See also Uncle B's Bakery, Inc. v. O'Rourke,* 920 F.Supp. 1405, 1434 (N.D.Iowa 1996) (noting that where the movant has an adequate legal remedy, a preliminary injunction will not issue).

Unlike situations where preliminary injunctions have been granted to keep a business from going under, plaintiffs have not established that they are in danger of losing all of their sales. The evidence establishes that 25% of their business comes from Wissota drivers. Assuming all 25% of these drivers sell their Ernie transmissions to IMCA drivers, this loss of sales accounts for 50% of plaintiffs' business. While the court does not demean this loss, it still remains that approximately half of plaintiffs' sales are intact. *Compare Ryko Mfg. Co. v. Eden Services,* 759 F.2d 671, 673 (8th Cir.1985) (affirming issuance of preliminary injunction where movant lost 95% of its sales). Moreover, the loss of sales that plaintiffs may suffer is specifically calculable in money damages. Additionally, considering the business' current debt, the court is not convinced that a preliminary injunction would accomplish much. It is possible that even with a preliminary injunction the business might be lost. Based on all these considerations, but primarily since plaintiffs have an adequate damages remedy, irreparable harm absent a preliminary injunction has not been established.

### B. Balance of the Harm

The defendants have presented evidence that a preliminary injunction would harm their association by forcing them to operate under uncertain rules, having to possibly change rules mid-season, possibly losing racers, and expending the funds to reprint and/or republish new rules. The

court is not overly moved by this last concern as it appears to be a minimal expense.

The rule changes, however, are a concern for the court because those changes impact the individual racers involved in this sport. Those drivers need to have certain rules to follow without the concern that those rules may change mid-season. Moreover, the racers need to have confidence in their sanctioning body. Interference by the court tends to erode this confidence. On the other hand, if the "rule clarification" is not enjoined, as many as one third of the Wissota racers will be forced to purchase new transmissions for their race cars at an approximate cost of $2200 a piece. The evidence presented supports that most drivers involved in Wissota race as a hobby and operate on a tight budget. Thus, the court is concerned with this additional expense.

Weighing these concerns, the balance of harm favors plaintiffs since they and the racers will suffer greater harm than the defendants absent a preliminary injunction. The court emphasizes, however, that although plaintiffs' harm is greater, they still have not shown that that harm is irreparable.

### C. *Likelihood of Success on the Merits*

■ In examining the likelihood of success on the merits, the court need not determine who "will ultimately win." *See Glenwood Bridge*, 940 F.2d at 371.

The likelihood that plaintiff ultimately will prevail is meaningless in isolation. In every case, it must be examined in the context of the relative injuries to the parties and the public. If the chance of irreparable injury to the movant should relief be denied is outweighed by the likely injury to other parties litigant should the injunction be granted, the moving party faces a heavy burden of demonstrating that he is likely to prevail on the merits. Conversely, where the movant has raised a substantial question and the equities are otherwise strongly in his favor, the showing of success on the merits can be less.

*Dataphase*, 640 F.2d at 113.

Plaintiffs bear a heavy burden. Although the balance of harm favors plaintiffs, they have not established irreparable harm. Therefore, plaintiffs must make a stronger showing of success on the merits. Plaintiffs have brought two intentional tort claims, interference with contractual relations and interference with business advantage, which both require a finding of specific intent to interfere. *See Peterson v. Zerr*, 477 N.W.2d 230, 233 (N.D.1991). While it is certainly possible that a jury could infer intent to interfere from the defendants' actions, having allowed plaintiffs' earlier transmissions to run with tacit approval and having offered no convincing explanation for the "rule clarification," they are not obligated to do so. Additionally, plaintiffs themselves are unsure why defendants would want to put them out of business. At this time, plaintiffs have not demonstrated that they are likely to succeed on the merits of their action. Thus, this factor favors the defendants.

### D. *Public Interest*

As to public interest, the parties are equally divided. On one hand, the court should not be the super-moderator of racing equipment disputes. *See Crouch v. NASCAR*, 845 F.3d 397, 403 (2nd Cir.1988) (noting that the district court should have deferred to NASCAR's interpretation of its own rules in the absence of an allegation that NASCAR acted in bad faith of in violation of the law). The court is neither inclined nor qualified to decide where the flywheel should be bolted, or whether a 4 ½ inch disc plate is better than a 5 ½ inch

disc plate. This is the purpose of sanctioning bodies like Wissota. The court, however, is inclined and qualified to hear the case that Wissòta adopted the rules with an eye to putting plaintiffs out of business. As to this concern, it is not in the public interest to have plaintiffs go out of business. *See Ryko*, 759 F.2d at 673 (affirming district court decision that public had an interest in having a small business continue operating). The public interest is with each party in different respects; consequently, this factor favors neither party.

## IV. Conclusion

As set forth above, the *Dataphase* factors do not support the issuance of a preliminary injunction. Therefore, **IT IS HEREBY ORDERED** that the motion is **DENIED**.